IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHARON CARR, | ) | Case No. 1:16-cv-01249 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      Introduction

Plaintiff Sharon Carr seeks judicial review of the final decision of the Commissioner of

Social Security ("Commissioner") denying her application for disability insurance benefits

("DIB") under Title XII of the Social Security Act.  This matter is before the court pursuant to 42

U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because the Commissioner's decision is supported by substantial evidence, I recommend

that the final decision of the Commissioner be **AFFIRMED**.

## II.      Procedural History

Carr filed her DIB application on September 4, 2012, alleging a disability onset date of

February 15, 2012.  (Tr. 181-82)  The application was denied initially and upon reconsideration.

(Tr. 82, 91)  Carr then requested a hearing before an administrative law judge.  (Tr. 125-26)

Administrative Law Judge Tammy Georgian ("ALJ") heard the case on October 30, 2014.  (Tr.

33-72)  On November 14, 2014, the ALJ issued a decision denying Carr's claim for benefits.

(Tr. 12-32)  The Appeals Council declined to review that decision on April 1, 2016, rendering

the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4)

## III.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[1]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to use

the five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be
   severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe
   impairment that has lasted or is expected to last for a continuous period of at

---

[1] "[W]ork which exists in the national economy' means work which exists in significant numbers either in
the region where such individual lives or in several regions of the country."  42 U.S.C. § 423 (d)(2)(A).

least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

The ALJ issued a decision on November 14, 2014, finding:

1. Carr meets the insured status requirements of the Social Security Act through December 31, 2017. (Tr. 17)

2. Carr has not engaged in substantial gainful activity since February 15, 2012, the alleged onset date. (Tr. 17)

3. Carr has the following severe impairments: organic mental disorder, affective disorders, anxiety disorders. (Tr. 18)

4. Carr does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 18)

5. Carr has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is able to understand, remember, and carryout instructions to perform simple, routine,

and repetitive tasks, but not at a production rate pace (i.e. assembly line work). The claimant's ability to deal with changes in the work setting is limited to simple, work-related decisions. (Tr. 20)

6. Carr is unable to perform any past relevant work. (Tr. 25)

7. Carr was born on March 28, 1958, and was 53 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. (Tr. 26)

8. Carr has at least a high school education and is able to communicate in English. (Tr. 26)

9. Transferability of jobs skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. (Tr. 26)

10. Considering Carr's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform. (Tr. 26)

Based on these findings, the ALJ determined that Carr had not been under a disability from February 15, 2012, through the date of the decision. (Tr. 27) Carr disagrees with the ALJ's handling of her residual functional capacity, claiming that the ALJ failed to account adequately for the continued severe functional memory problems she is experiencing.

## V.     Medical Evidence & Opinions

In February 2012, Plaintiff was admitted at University Hospital with complaints of frontal headaches and pressure on the left side of her head. Diagnostic testing revealed an intracranial cyst, which required surgical removal. (Tr. 278, 312)

### A.     Alan S. Hoffer, M.D.

On March 2, 2012, Carr underwent neurosurgery. (Tr. 311) During the surgery, Dr. Hoffer removed a left ventricle mast. (Tr. 311) Following surgery, Carr experienced memory

4

loss. (Tr. 311) Dr. Hoffer suspected that Carr's memory problem was caused by irritation of the fornix during surgery. (Tr. 311)

A subsequent neurological exam in December 2012 was "unremarkable." (Tr. 420) However, Carr reported continued problems with her short-term memory. (Id.) Dr. Hoffer noted that he "spoke at length" with Dr. Griggins who was in charge of Carr's cognitive therapy. (Id.) Reportedly, Dr. Griggins advised him that Carr's memory was "actually quite good" and that she was "fully utilizing her coping mechanisms." (Id.) He concluded that overall Carr was doing well. (Id.)

**B.     Philip S. Fastenau, Ph.D.**

At the request of Dr. Hoffer, Dr. Fastenau met with Carr for a neuropsychological consultation on April 9, 2012. (Tr. 333-36) Upon evaluation, Carr scored "below expectation on several measures of memory acquisition and retention." (Tr. 334) Carr scores were mildly elevated for depression and severely elevated for anxiety based on self-reported symptom rating scales. (Tr. 335) Dr. Fastenau opined that Carr's anxiety was acute (i.e., reactive to her current situation). (Id.) Based on informal reports, Dr. Fastenau concluded that Carr's memory deficits were improving. (Id.) However, she continued to exhibit acute onset of memory loss following surgery. (Id.)

The ALJ gave great weight to Dr. Fastenau's opinion that Carr appeared to be improving but with some persisting deficits. (Tr. 24)

**C.     Cynthia Griggins, Ph.D.**

Drs. Hoffer and Fastenau referred Carr to Dr. Griggins for neuropsychological rehabilitation. Dr. Griggins treated Carr through individual and group therapy from April 2012

through May 2013.  (Tr. 328, 330, 384)  At the beginning of therapy, Dr. Griggins reviewed Dr.

Fastenau's evaluation and conducted further testing in order to supplement and expand upon his

findings.  (Tr. 329)  The results indicated that Carr had "profound difficulty learning a list of

words."  (Id.)  However, her memory for nonverbal material had improved somewhat and now

represented a "mild impairment for someone of her age."  (Id.)

Dr. Griggins also tested executive functioning, noting, "deficits in this area can interfere

greatly with patients' use of compensatory strategies."  (Id.)  Dr. Griggins stated that Carr

performed well on the executive functioning test given by Dr. Fastenau and made an

improvement on the second test.  (Id.)  Dr. Griggins suggested that Carr might have difficulties if

given a large amount of information at once or if she is forced to multi-task.  (Id.)

Carr's initial goals were to return to tasks of independent living.  (Tr. 330)  Eventually

she was able to perform many tasks of daily living (i.e., grooming, bathing, cooking, cleaning,

laundry, etc.) on her own.  (Id.)  She also regained the ability to drive short distances.  (Id.)

Carr's next goal was to return to work.  (Tr. 330)  In June 2012, Dr. Griggins and Carr

discussed Carr's return to work at length.  (Tr. 341)  At that time, Carr had made "considerable

[memory] improvement," but it was noted that she was "still not even in average range."  (Tr.

342)  Carr agreed to contact her former employer to see what work was available.  (Id.)  The next

month, however, Dr. Griggins recommended Carr not return to work at that time due to "poor

memory and continued impulsivity."  (Tr. 343)  Eventually, Carr did return to her mother's travel

agency, to use it as a "laboratory" to asses her functioning and try out strategies.  (Tr. 330)

According to Dr. Griggins, Carr remained "very afraid and ambivalent about returning to

work, mostly because of the memory issues…[b]ut also, Ms. Carr was unsure if she wanted to

return to her job or find something different." Tr. 332. Dr. Griggins eventually referred Carr to an occupational therapist in order to address job tasks more specifically. (Id.)

In September 2012, Dr. Griggins noted that Carr's ability to remember stories improved. (Tr. 352) She further noted that Carr exhibited the ability to learn a new technology. (Tr. 353) She also noted that Carr exhibited excellent follow-through, work habits, and social awareness. (Tr. 353) However, she noted that Carr's abilities to learn new words, store and retrieve words, and remember a design were weak. (Tr. 252) Later that month, Carr was able to book a flight with her cellphone. (Tr. 371) However, Dr. Griggins noted that Carr did not view this accomplishment as a sign of progress and continued to hope for total memory recovery. (Id.)

In January 2013, Dr. Griggins noted continued short-term memory difficulties on testing. (Tr. 375) Dr. Griggins determined that Carr would benefit from additional occupational therapy to learn compensatory strategies for her ultimate return to work. (Id.) Dr. Griggins also noted that Carr was able to perform simple scheduling tasks but had difficulty if a more complex situation was provided. (Tr. 378)

In February 2013, Dr. Griggins completed a neuropsychological rehabilitation report. (Tr. 328-32) In the report, Dr. Griggins concluded that Carr's memory was still moderately impaired. (Tr. 332) She also determined that Carr's ability to solve complex problems was mildly impaired. (Id.) Dr. Griggins stated that Carr's acceptance of her problem and need to use compensatory strategies was incomplete at the time but that she had the "work ethic, work habits, and skills to return." (Id.) Dr. Griggins opined that it would be another six to eight months before Carr could return to work. (Id.) The ALJ grave great weight to Dr. Griggins' opinion because she had treated Carr on a consistent basis for the memory loss. (Tr. 23) The

ALJ also stated that the opinion was consistent with the record as a whole, which showed "improvement with proper treatment methods." (Id.)

On March 12, 2013, Dr. Griggins noted that Carr had problems understanding reports. (Tr. 382-83) Dr. Griggins stated that Carr identified everything as a memory problem when sometimes the problem was comprehension. (Tr. 382) Two weeks later, Dr. Griggins stated that Carr's comprehension was still a problem at times but that her use of memory compensatory strategies was excellent. (Tr. 383) She also noted that Carr's confidence was still very low. (Id.) Dr. Griggins also theorized that it was possible that what Carr labeled as memory problems might actually be that Carr is unsure or lost when faced with complex problems. (Id.)

In May 2013, Carr complained that she occasionally forgot the content of conversations and comprehending what she read. (Tr. 384) Dr. Griggins explained that these issues happened to everyone and that Carr had strategies if she would use them. (Id.) Dr. Griggins planned to help Carr build her confidence. (Id.)

### D.     Cynthia Carleton

Ms. Carleton, a vocational rehabilitation counselor and job coach, worked with Carr between January 30, 2014, and May 21, 2014. (Tr. 385-411) She assisted Carr with basic computing skills and providing specific strategies for Carr's work at the travel agency. (Tr. 398-01) It was noted that most of the instruction was to take place on-site at the travel agency. (Tr. 397)

After the first month, Ms. Carleton reported that Carr had developed many strategies for retaining new information. (Tr. 401) She also observed a marked improvement in Carr's endurance, persistence, and confidence. (Id.) She noted that Carr had "exceptional" customer

service and telephone skills.  (Id.)  Ms. Carleton concluded that Carr could learn new information and complete complex processes if she had detailed steps in writing to follow.  (Id.)  She further concluded that Carr did not need a job coach to record steps of the new processes she learned. (Tr. 402)  The ALJ gave great weight to Ms. Carleton's opinion, finding it was "well supported by her observations in a training setting."  (Tr. 23)  The ALJ also noted that Ms. Carleton's opinion was consistent with the findings and opinions of Dr. Griggins and the record as a whole. (Id.)

By the end of the training period, Ms. Carleton reported that Carr independently performed all tasks asked of her at the travel agency.  (Tr. 411)  Ms. Carleton further noted that Carr demonstrated the ability to learn new information including information that she had not written down.  (Id.)  She explained that Carr still needed to write down long and complex tasks but noted that Carr could now perform her most complex task (involving 9 pages of instructions) from memory.  (Id.)

### E.  Cynthia Anderson

In October 2012, Cynthia A. Anderson, OTR/L, completed a return to work evaluation on behalf of Carr.  (Tr. 337-40, 359-62)  Ms. Anderson noted that Carr had completed her outpatient occupational therapy program.  (Tr. 359)  Ms. Anderson explained that Carr had returned to driving and engaging in independent self-care.  (Id.)  Ms. Anderson determined that Carr had deficits in delayed recall and retention of information, as well as high levels of frustration related to tasks she had difficulty organizing.  (Tr. 362)  She noted that Carr successfully implemented compensatory strategies to improve recall and retention.  (Id.)  Ms. Anderson opined that those strategies would be helpful for job related tasks and would decrease Carr's frustration.  (Id.)  Ms.

Anderson concluded that Carr "had the potential to return to gainful employment with completion of vocational retraining."  (Tr. 362)

The ALJ gave great weight to Ms. Anderson's opinion that Carr could return to work.  (Tr. 22)  The ALJ found that the opinion was "consistent with Ms. Anderson's findings and the record as a whole.  (Id.)

### F.    Eric Shapiro, M.D.

Carr's primary care physician, Dr. Shapiro, treated her for almost 20 years.  (Tr. 424)  Dr. Shapiro treated Carr intermittently for various conditions including shoulder pain, back pain, cervical radiculitis, and cervical disk displacement.  (Tr. 432, 488, 504).  He also noted Carr's memory problems at times.  See e.g., June 9, 2013, "memory deficits improving but continue." (Tr. 429)

On August 7, 2014, Dr. Shapiro completed a Medical Source Statement ("MSS") for Carr.  (Tr. 424-28)  Dr. Shapiro noted that Carr had a "markedly impaired short term memory." (Tr. 424)  He also checked several boxes regarding standing, walking, and sitting limitations. (Tr. 426)  The checkboxes indicated that Carr could not stand/walk for longer than 1 hour at a time for a total of 4 hours in an 8-hour workday or sit for longer than 3 hours at a time for a total of more than 6 hours in an 8-hour workday.  (Id.)  Dr. Shapiro concluded by stating that "[t]he limiting issue for Mrs. Carr is her cognitive impairment for poor short term memory."  (Tr. 428)

The ALJ gave little weight to Dr. Shapiro's opinion because it was "overstated and unsupported by the record as a whole."  (Tr. 25)  The ALJ further found that Dr. Shapiro's opinion was "inconsistent with the treating records and opinion of Dr. Griggins who treated the claimant on a consistent basis for her cognition and memory issues."  (Id.)

### G. State Agency Reviewers

At the state agency level, Carr's file was reviewed at the initial level by Roseann Umana, Ph.D. At that time, Carr failed to attend two consultative examinations. (Tr. 88) As a result, Dr. Umana determined that the evidence was insufficient to reach a decision. (Tr. 88)

Upon reconsideration, Bruce Goldsmith, Ph.D., reviewed Carr's file. He opined that Carr retained the ability to perform a wide range of simple, repetitive tasks involving superficial contact with others in a setting free of strict production standards or fact pace. (Tr. 103) The ALJ gave great weight to Dr. Goldsmith's opinion. (Tr. 24) The ALJ found the opinion "well supported" by treatment notes and the opinions of Dr. Griggins and Ms. Carleton. (Id.)

### H. Third Party Statements

The ALJ also reviewed several third party statements. (Tr. 24) Third party statements were submitted by Carr's children (Jason and Ashley) and Carr's sister (Dawn Scadlock). (Tr. 264-69) Carr's daughter indicated that Carr's memory had improved but that she still relied heavily on notes for assistance. (Tr. 266) Carr's son stated that Carr forgot dates, events, and was sidetracked in conversations. (Tr. 264) Both children also described Carr's frustration over her memory difficulties. (Tr. 264, 266) The ALJ gave great weight to the statements from Carr's children.

Dawn Scadlock, Carr's sister, provided an affidavit on behalf of Carr. (Tr. 268-69) Ms. Scadlock averred that Carr's functioning improved post-surgery but her short-term memory problems remained. (Tr. 268) Ms. Scadlock asserted that, despite intensive coaching and support, Carr still had to "ask for help in everything she does." (Tr. 269) Ms. Scadlock stated that if Carr were not family, she would not have stayed employed at the travel agency. (Id.) She

11

also reported that Carr would be unable to live independently without the help of her son. (Id.) The ALJ gave only partial weight to Ms. Scadlock's affidavit. (Tr. 24) The ALJ found Ms. Scadlock's statement that Carr needs help with "everything" unsupported by the record including training notes and Dr. Griggins' opinion. (Id.)

## VI. Testimonial Evidence

### A. Carr's Testimony

Carr testified that she had lived with her son since her surgery. (Tr. 38-39) She stated that she was able to drive short distances of 10 minutes or less. (Tr. 39) Carr testified that she left her job as a patient access representative after she was diagnosed with a tumor. (Tr. 40) Carr also previously worked as an expediter and bookkeeper. (Tr. 41-42) The bookkeeping position was for her mother's travel agency. (Tr. 42)

At the time of the hearing, Carr worked 25-30 hours a week for her mother's travel agency. (Tr. 42-43) When asked if she would be able to work full time hours, Carr was uncertain because she stated that she got stressed "after a bit." (Tr. 45)

Carr testified that her short-term memory problem was her biggest complaint. (Id.) When asked if she had allegations regarding any other impairments beside her memory, Carr replied, "No." (Id.)

Carr testified that she attended both occupational and group therapy. (Tr. 45-46) She expressed that the group therapy was challenging because of her memory problems. (Tr. 46) When asked if her short-term memory had improved, Carr replied that it had improved "somewhat" and that the utilization of notes and phone reminders helped. (Tr. 47) She stated

that she no longer wrote reminders to turn off the stove, but that she accidentally left it on the previous week.  (Tr. 47-48)

Carr's attorney then questioned her and confirmed that she was having problems with her elbow, knee, and neck.  (Tr. 49-51)  Carr also complained of intermittent headaches and head discomfort.  (Tr. 51-52)

Carr testified that her sister Dawn helped her at the travel agency job.  (Tr. 54)  Carr's attorney then asked if she thought there was any other job she could perform eight hours a day, five days a week.  (Tr. 55)  Carr replied that she did not.  (Id.)  Carr testified that she got frustrated dealing with changes in her routine.  (Tr. 56)  She stated that she asked questions of but was unable to remember the answers.  (Id.)

The ALJ then asked Carr why she thought she could not perform any other jobs.  (Tr. 57)  Carr stated that she did not know if another job would allow her to rely on written notes.  (Id.)  Carr testified that she still relied on notes for doing her reports at work.  (Id.)  She stated that her notes varied from one page to eight pages.  (Id.)  She also stated that despite having detailed lists, she still had trouble at times because if she made a mistake she had trouble figuring out how to correct it.  (Tr. 58)

### B.  Vocational Expert Testimony

Vocational Expert Gene Burkhammer ("VE") also testified at the hearing.  (Tr. 61-69)  The VE testified that Carr's prior jobs as a patient advocate, expediter, and bookkeeper all constituted past relevant work.  (Tr. 60-62)  The ALJ then asked the VE to assume a hypothetical individual with the ability to understand, remember, and carryout instructions; who was limited to simple, routine, and repetitive tasks but not at a production line pace, such as assembly work.

(Tr. 62)  He further stated that the individual could have occasional interaction with the public and coworkers but that dealing with changes in a work setting was limited to simple work related decisions.  (Id.)  The VE testified that the hypothetical individual could not perform Carr's past work.  (Tr. 63)  However, the VE stated that the individual could perform work as an order puller, laundry laborer, or housekeeping cleaner.  (Id.)  Next, the ALJ changed the hypothetical by limiting the individual to sedentary work.  (Tr. 65)  The VE testified that the second hypothetical individual could perform work as an addresser or a food and beverage clerk.  (Tr. 66)

In response to questioning by Carr's counsel, the VE stated that in order to perform a job an individual would have to retain at least simple instructions.  (Tr. 67)  The VE explained that the instructions would not be defined by a certain number of steps, but would be "simple, unskilled tasks that aren't complicated or stressful or confrontational or as far as other individuals are concerned."  (Id.)  Carr's counsel then asked the VE if an employee was still unable to do a job after three to six months of job coaching, would that individual be able to maintain and sustain employment.  (Tr. 68)  The VE stated that the reason for a job coach is to transition into independent full time work.  (Id.)  He further explained that if a person were unable to work independently after six months of job coaching the VE could not see how they could do any job.  (Id.)  The VE stated that there would be no jobs for someone performing simple work that is being accommodated.  (Tr. 69)  The VE also stated that if someone shut down and would not communicate or follow through with a job there would be no employment for that individual.  (Id.)

## VII. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing*

*Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

**B.      The RFC is Supported by Substantial Evidence**

Carr presents multiple arguments for review.[2]  At their core, the arguments attack the

ALJ's RFC finding.  ECF Doc. No. 16, Page ID# 647-54.  The Commissioner counters that the

ALJ's RFC determination accurately portrayed Carr's limitations and was supported by

substantial evidence.  ECF Doc. No. 18, Page ID# 692-98.

The residual functional capacity is the most that a claimant can do despite her limitations.

20 C.F.R. § 404.1545.  The RFC is based on all relevant evidence in the case record.  Id.  All

medically determinable impairments are to be considered when assessing the RFC - severe and

non-severe.  Id.

Here, the ALJ considered Carr's short-term memory loss but found Carr's allegations of a

total inability to work not entirely credible.  (Tr. 21, 23)  Instead, the ALJ determined that Carr

retained the capacity to complete simple, routine, and repetitive tasks at a non-production rate

pace.  (Tr. 20)  Substantial evidence supports this determination.  The substantial evidence

includes opinions and treatment notes from several medical providers.

Dr. Goldsmith's opinion supports the RFC determination.  Dr. Goldsmith opined that

Carr retained the ability to perform a wide range of simple, repetitive tasks involving superficial

contact with others in a setting free of strict production standards or fast pace.  (Tr. 103)  The

---

[2] Carr argues that the ALJ failed to (1) appreciate the difference between short-term and long-term
memory loss for purpose of the RFC; (2) include functional limitations recommended by medical sources;
and (3) include functional limitations caused by Carr's non-severe impairments.  ECF Doc. No. 16, Page
ID# 647-54.

ALJ adopted these same limitations in her RFC with the added limitation that Carr's ability to deal with changes in the work setting was limited to simple, work-related decisions. (Tr. 20)

Opinions from Dr. Griggins and Ms. Carleton further support the RFC. (Tr. 23) In February 2013, Dr. Griggins opined that Carr's memory was moderately impaired with a mild impairment in her ability to solve complex problems. (Tr. 332) Dr. Griggins stated at that time that Carr had to continue to work on accepting her problems and using her compensatory strategies. (Id.) Dr. Griggins concluded that Carr had the work ethic, habits, and skills to return to work. (Id.) One year later, Ms. Carleton observed that Carr had developed many successful strategies for recalling new information. (Tr. 401) She also found that Carr's endurance, confidence, and persistence had improved. (Id.) Ms. Carleton opined that Carr required a job with repetitive tasks or tasks with distinct steps. (Tr. 401)

The RFC was also consistent with the April 2012 opinion of Dr. Fastenau that found Carr's memory deficits were improving. (Tr. 24, 335)

The only contradictory opinion was from Dr. Shapiro. In August 2014, Dr. Shapiro stated that Carr's short-term memory was "markedly" impaired. (Tr. 424) However, the ALJ gave little weight to Dr. Shapiro's opinion because it was inconsistent with the other evidence, including the opinions of Dr. Griggins, who treated Carr on a consistent basis for her cognition and memory issues. (Tr. 25) Dr. Shapiro's opinion was inconsistent with other evidence, discussed above, including the opinion of her specialist and associated professionals. As the ALJ pointed out, the record shows that Dr. Griggins (not Dr. Shapiro) treated Carr consistently for her memory and cognitive issues. When evaluating opinion evidence, the regulations provide that the ALJ should give "more weight to the opinion of a specialist about medical issues related to

his or her area of specialty than to the opinion of a source who is not a specialist."  20 C.F.R. §

404.1527.  Thus, the ALJ's treatment of Dr. Shapiro's opinion was proper.

Furthermore, even if Dr. Shapiro's opinion could support another conclusion, the ALJ

decision "must stand if the evidence could reasonably support the conclusion reached."  *Her v.*

*Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999); *Jones v. Comm'r of Soc. Sec.*, 336

F.3d 469, 475 (6th Cir. 2003) ("[W]e must defer to an agency's decision even if there is

substantial evidence in the record that would have supported an opposite conclusion, so long as

substantial evidence supports the conclusion reached by the ALJ.")(internal quotations and

citation omitted).  This is so because there is a "zone of choice" within which the Commissioner

can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,*

730 F.2d 1147, 1150 (8th Cir. 1984).  Here, the evidence could reasonably support the ALJ's

RFC determination and, therefore, must stand.

Having determined that the ALJ's RFC determination is supported by substantial

evidence, the undersigned will now address Carr's more particularized arguments.  First, Carr

argues that the ALJ failed to appreciate the difference between long-term and short-term

memory.  ECF Doc. No. 16, Page ID# 647-48.  The record does not reflect such confusion.  The

ALJ consistently discussed Carr's short-term memory problems.  (See e.g. Tr. 21, Tr. 22, "a

memory test, demonstrated 'considerable' improvement in claimant's *immediate* recall";

"claimant's ability to learn *new* technology…was 'excellent.' " ) (emphasis added); (Tr. 23.

"…claimant developed many strategies to help herself remember *new* information…") The ALJ

also referenced several medical opinions focusing on Carr's short term memory impairments.

(Tr. 22-24)  Thus, Carr's claim that the ALJ did not appreciate the different between short and long-term memory is refuted by the ALJ's actual discussion of the issue.[3]

Next, Carr asserts that the ALJ did not include functional limitations in the RFC that Carr needed a "supportive environment" and strategies for compensating for her memory loss.  ECF Doc. No. 16, Page ID# 648-50.  Carr contends that the RFC should have accommodated strategies such as cell phone scheduling and recording information on lists.  Id. at 694.  Carr also argues that the RFC should have accommodated her need for a "supportive work environment."  Ultimately, Carr concludes that the ALJ's determination should be overturned for failure to evaluate these "special conditions" under 20 C.F.R. § 404.1573.

Carr argues that 20 C.F.R. § 404.1573 provides examples of special conditions in employment that must be considered in determining disability.  However, as the Commissioner points out, § 404.1573 is not relevant.  The provision pertains to a determination of whether particular work can be considered substantial gainful activity.  Thus, contrary to Carr's suggestion, the ALJ was not required to address these factors because they do not apply to the RFC.[4]

_____

[3] Carr argues that her ability to drive, perform household chores, shop in a store, go out alone, count change, and handle a checking account all encompass long-term memory activities not short-term memory activities.  ECF Doc. No. 16, Page ID# 647.  Carr provides no authority for this bare contention.  Moreover, the ALJ did not rely solely on Carr's acts of independent living to support her determination that Carr's short-term memory had improved.  Thus, Carr's argument is not well taken.

[4] Moreover, contrary to Carr's suggestion, § 404.1573 supports the ALJ's determination.  §404.1573 provides that "work done under special conditions may show that you have the necessary skills and ability to work at the substantial gainful activity."

Carr's next contention is that the medical opinions were that Carr's condition required her to have workplace accommodations. Carr seems to base this contention, at least in part, on Ms. Carleton's suggestion that Carr would "work best in an environment that is supportive of her need for clear instructions and clarification and the time require (sic) to obtain that instruction." (Tr. 401) Carr also appears to base her argument on several notes that Carr needed assistive devices for remembering things throughout the day.

As an initial matter, Ms. Carleton's statement that Carr would "work best" in an "environment supportive of her need for clear instructions" does not constitute a necessary limitation in the RFC. The RFC is the most you can do, not what is the best or ideal environment. Notably, Ms. Carleton stated that Carr would "work best" in an environment supportive of the need for clear instructions and clarification. However, Ms. Carleton also stated that Carr "require[d] a job with repetitive tasks that she can write down…in detail so that she can remember them." (Tr. 401)(emphasis added) Thus, the wording of this recommendation seems to imply that all that was *required* for Carr to work was a job with repetitive tasks and for Carr to be allowed to write the instructions down. This conclusion is further bolstered by the fact that a similar statement was not included in Ms. Carleton's final recommendation. (Tr. 411) At that point, Ms. Carleton indicated that Carr had demonstrated an ability to learn information and only needed to write down "long and/or complex tasks." (Id.) In fact, Ms. Carleton noted that Carr had committed most of a complex 9-page instruction sheet to memory. (Id.) Thus, the ALJ's determination that Carr could perform simple, routine, and repetitive tasks at a non-production pace is consistent with Ms. Carleton's findings. Contrary to Carr's suggestion, Ms. Carleton's

recommendations do not support a need for extra accommodation or a special environment to perform simple, repetitive tasks.

Similarly, no other medical source opined that Carr's utilization of memory strategies would interfere with her ability to do work. Dr. Goldsmith put forth a RFC that largely matched the ultimate RFC. Ms. Anderson also opined that Carr "had the potential to return to gainful employment with completion of vocational retraining." (Tr. 34) Dr. Griggins said the same thing, stating that Carr had the "work ethic, work habits, and skills to return [to work.]" (Tr. 332) Therefore, Carr fails to show that the utilization of memory retention strategies was necessary for the completion of simple, repetitive tasks or would interfere with her ability to work.

Carr's main point is that the limits of her short term memory affect her ability to do what she once could do without experiencing anxiety or potential confusion. While that may be true, that is not the standard for determining whether she is disabled. The ALJ expressly recognized Carr's limitations when she found that Carr could not perform her past work. But that does not end the question. The issue is not whether Carr could do her old job; the question is whether, given her new limitations, she can do any job. The ALJ properly found, based on the medical and vocational evidence, that there were numerous jobs Carr would be able to do even with her memory limits.

Finally, Carr contends that the ALJ failed to account for her non-severe impairments in the RFC. ECF Doc. No. 16, Page ID# 652-654. Carr's argument is not well taken. Although SSR 96-8p requires the ALJ to *consider* both severe and non-severe impairments when formulating the RFC, there is no indication that the ALJ failed to do so.

The ALJ considered Carr's non-severe impairments, but found that there was no medical evidence to support that Carr's elbow, knee, neck, head, or headache pain had any limiting effect on her ability to work. (Tr. 18) As the ALJ recognized, a diagnosis alone does not indicate the functional limitations caused by the condition. *See Young v. Sec'y of Health and Human Servs.,* 925 F.2d 146,151 (6th Cir.1990) (diagnosis of impairment does not indicate severity of impairment). The only evidence that Carr had any physical limitations was found in the MSS provided by Dr. Shapiro. Dr. Shapiro opined that Carr could not stand and walk for more than four hours a day and one hour at a time. (Tr. 426) Dr. Shapiro also opined that Carr could not sit for more than six hours a day and three hours at a time. (Id.)

The ALJ found Shapiro's opinion "overstated and unsupported by the record as a whole." (Tr. 25) The ALJ is correct. Other than Dr. Shapiro's unexplained opinion, the record fails to contain any evidence that Carr had difficulties sitting, walking, or standing. Carr even admits that the MSS "is not totally clear about the basis for the physical limitation on Ms. Carr's ability to stand and walk." ECF Doc. No. 16, Page ID# 654. Carr's self-reports including her hearing testimony, function reports, and disability reports failed to include any complaints about her ability to sit, stand, or walk. (Tr. 21) Further, Dr. Shapiro's treatment notes consistently contained "no evidence of range of motion or strength abnormalities." (Tr. 18) Rather, Dr. Shapiro consistently found that Carr had normal muscle strength and gait. (Tr. 18, 434-36, 439) Despite Dr. Shapiro's MSS, he apparently never provided anything other than minor, short-term therapies for any of the physical conditions that he asserted were disabling. The ALJ also pointed to a May 2014 examination by Dr. Stein that while revealing some wrist pain, expressly

stated that Carr had no back pain and no other joint pain.  (Tr. 548-49)  He also noted that Carr had no muscle weakness.  (Tr. 549)

Based on all of the evidence, the ALJ appropriately discounted Dr. Shapiro's unsupported and unexplained opinion regarding Carr's physical limitations.  Carr fails to offer any other evidence that her physical impairments caused any work-related limitations.  Thus, the ALJ was not required to include Carr's non-severe impairments in the RFC.

## VIII.  Recommendation

Substantial evidence supports the ALJ's RFC findings, and the ALJ correctly applied the applicable legal standards.  Thus, the undersigned finds that Carr has not demonstrated a basis upon which to reverse or remand the Commissioner's decision.  I recommend that the final decision of the Commissioner be **AFFIRMED**, pursuant to 42 U.S.C. §405(g).

Dated: May 22, 2017

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).